UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF ) <br> THE UNITED STATES FOR: ) <br> ) <br> 1. FOR A WARRANT TO OBTAIN PRECISE ) <br> LOCATION AND CELLSITE LOCATION ) <br> DATA REGARDING A T-MOBILE CELLULAR ) <br> PHONE ASSIGNED CALL NUMBER (617) 608-8668 ) <br> AND IMSI 310260408914424 (Target Telephone #3) ) | 16-mj-4023-DHH |

## AFFIDAVIT OF MARK J. CONCANNON

I, Mark J. Concannon, Special Agent, a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA") being duly sworn, depose and state:

1. I am a Massachusetts State Police Trooper assigned to the Division of Investigative Services, Narcotics Unit, and I have been assigned as a Task Force Officer ("TFO") with the DEA since October 2012. I am currently assigned to the DEA Boston Tactical Diversion Squad located in Boston, Massachusetts. I am a graduate of the Massachusetts State Police Academy and have been a police officer since 2005.

2. As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. § 2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code. In 2003, I graduated from the Massachusetts Criminal Justice Training Council basic reserve intermittent academy. In 2005, I graduated from the Massachusetts State Police Academy. As a Massachusetts State Trooper, I was initially assigned to patrol out of the Danvers and Norwell Barracks, and then to the Community Action team in the city of Brockton working in a high crime area focusing on gang and drug activity. In

1

October of 2012, I was re-assigned to the Division of Investigative Service and assigned to the Drug Enforcement Administration ("DEA") working as a task force officer in the Boston Tactical Diversion Squad. I have a Bachelor of Science degree in Criminal Justice from the University of Massachusetts, Lowell. I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

       3. My duties include, but are not limited to, the investigation of narcotics violations and offenses. In the course of performing these duties as a state police officer, I have been involved in narcotics purchases as an undercover officer. I have participated in various aspects of narcotics investigations including controlled purchases, undercover purchases, and surveillance. I have been involved in over 200 narcotics investigations leading to arrests which included heroin, cocaine, marijuana, oxycodone, and other controlled substances. Through my training and experience, I am familiar with appearance, packaging, texture, and smell of many controlled substances. I am familiar with the terminology used by both narcotics users and distributors of controlled substances and the manner in which they disguise the subject of their conversations and operations. I have participated in joint investigations with the DEA, Federal Bureau of Investigation ("FBI"), and numerous state and local agencies. On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations. I am also familiar with the full range of methods, practices, and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

4. I have personally participated in the investigation discussed in this affidavit. This involvement has included, among other things, debriefing cooperating sources and conducting surveillance. I also am familiar with the facts and circumstances of this investigation from oral and written reports made by me, other agents of the DEA, and members of other federal, state and local law enforcement agencies who have assisted in this investigation.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included each and every fact known to me and other law enforcement officers involved in this investigation, but only such facts necessary to establish probable cause for the issuance of this search warrant. Facts not set forth herein are not relied on in reaching my conclusion that there is more than sufficient evidence to support the issuance of the requested order.

## PURPOSE OF AFFIDAVIT

6. I submit this affidavit in support of applications for a specific location telephone warrant. I seek an application for an Order pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. 2703(C)(1)(A), directing T-Mobile to assist agents of the DEA by providing, for a period of 30 days, all information, facilities and technical assistance needed to ascertain the precise physical location of a target telephone, including but not limited to data indicating the specific latitude and longitude of, or other precise location information concerning the target telephone, including tower and antenna face or cell-site information (the "Requested Location Information"). The target telephone is a T-Mobile cellular telephone assigned call number (617) 608-8668, and IMSI 310260408914424 (Target Telephone #3), subscribed to in the name of Carmello Santiago, 154 Walnut Avenue, Boston, MA 02119, and used by an unknown male who is referred to as LA MAKINA (hereinafter, "LA MAKINA") (hereinafter, "Target Telephone") . LA MAKINA is

also known to use a T-Mobile cellular phone assigned call number (857) 294-5268, also subscribed to Carmello Santiago, at 154 Walnut Avenue, Boston, MA 02119.

7. As discussed further below, probable cause exists to believe that the requested information regarding the Target Telephone described in Paragraph 6 will constitute or lead to evidence regarding offenses involving the distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); the use of a communication facility in the commission of narcotics trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit narcotics trafficking offenses, in violation of 21 U.S.C. § 846; and/or maintaining drug-involved premises in violation of Title 21, United States Code, Section 856 (collectively, the "Target Offenses"), as well as the identification of individuals who are engaged in the commission of the Target Offenses.

8. For the reasons set out in this Affidavit, I believe that LA MAKINA is committing one or more of the Target Offenses, and that obtaining information about the physical location of the Target Telephone will help determine the approximate location of LA MAKINA so that law enforcement agents can conduct physical surveillance of subjects of this investigation without compromising the covert nature of the investigation; will lead to identification of LA MAKINA and LA MAKINA's criminal associates, including other suppliers, runners and customer/redistributors; and will lead to the identification of residences and stash locations.

**TARGET-SUBJECT**

9. The Target-Subject pertinent to the current requested order and warrant is Melvin Rivera-Quinones, a/k/a Alex, a/k/a LA MAKINA, a/k/a Carmel Santiago-Santiago, is a Dominican male whose DOB is believed to be 4/21/1985, with a last known address of 154 Walnut Ave. Apt.1, Roxbury, Massachusetts (hereafter, "LA MAKINA"). LA MAKINA has a separate identity out of Pennsylvania as Carme Santiago Santiago, DOB 01/27/1988, SSN# 596161599.

## BACKGROUND OF THE INVESTIGATION

10. Beginning in the fall of 2014, other agents and I began investigating the drug trafficking activities of Juan PENA and his associates in the Randolph, Quincy, and Boston area. PENA and his associates were involved with the "Mozart Street Gang" in Boston, Massachusetts. The Mozart Street Gang operates out of Jamaica Plain, Massachusetts, and is known to be involved in the sale of narcotics and firearms. There are dozens of Mozart Street Gang members (also referred to herein as "associates") of varying ages (from teenagers to middle-aged men). Many are of Dominican descent.

11. PENA is a drug trafficker who was distributing grams of heroin and bulk quantities of oxycodone pills in the Boston, Massachusetts area. Between the summer of 2014 and the summer of 2015, PENA sold over 200 grams of heroin and 300 oxycodone 30 mg pills in nine separate purchases to me as an undercover officer. I made multiple undercover buys from PENA that are summarized briefly below. UC means a buy by the undercover officer. CS means a controlled buy by a specified confidential source or sources at my direction. Most of the conversations were recorded, and the meets occurred primarily in Randolph, Massachusetts:

| Date | Drugs Purchased and by whom | Amount Paid |
| --- | --- | --- |
| July 10, 2014 | UC: 20 grams heroin | $1,200 |
| August 21, 2014 | UC: 30 grams heroin | $1,800 |
| August 26, 2014 | UC: 200 oxycodone 30 mg pills | $5,300 |
| September 4, 2014 | UC: 225 oxycodone 30 mg pills (but shorted – only 175 provided) | $5,960 |
| September 23, 2014 | UC: 30 grams heroin | $1,800 |
| October 28, 2014 | UC: 30 grams heroin | $1,800 |

| December 10, 2014 | UC: 30 grams heroin | $1,800 |
|---|---|---|
| January 21, 2015 | UC: 30 grams heroin | $1,800 |
| March 12, 2015 | UC: 30 grams heroin | $1,800 |
| May 17, 2015 | PENA texts the UC to offer to sell drugs | Not purchased |
| June 24, 2015 | CS-4 and CS-5: 30 grams heroin | $1,800 |
| **Total UC/CS Buys** | **375 oxycodone pills (30 mg) 230 grams of heroin** | **$25,060** |

Each of the above-referenced drug purchases were arranged with PENA over the telephone.

12.     Following the undercover purchases, authorization was obtained to intercept wire communications involving PENA and later, his source of supply, Luis Alberto ARIAS.

    a.     On August 11, 2015, the Honorable Richard J. Stearns entered an order authorizing the interception of wire communications on (781) 518-8430, a telephone used by PENA (Target Telephone #1).   15-MC-91252-RJS.   Interceptions began on August 12, 2015, and were terminated on September 10, 2015.

    b.     On September 18, 2015, authorization was obtained from the Honorable Dennis Saylor, IV to intercept communications to and from a prepaid T-Mobile cellular telephone assigned call number (781) 534-4170, used by ARIAS (Target Telephone #2).   Interceptions began on September 23, 2015, and terminated on October 7, 2015.

The conversations were in Spanish.   The information set forth in this Affidavit is from draft translations and transcripts of one of those calls.   In addition, some punctuation has been added to make the draft transcript more readable.

13.     Based on the intercepted wire communications on Target Telephones #1 and #2, and surveillance established in support of the wire interceptions, drugs and illegal handguns were seized as follows:

**October 5, 2015:   Seizure of Four Kilograms of Cocaine, Handgun, Phones, and Fake Identity Packages.**

14.     On October 4, 2015, following intercepted calls in which ARIAS made plans to meet a source of supply from New York, investigators followed ARIAS from his residence at 12 Quarry Lane, Malden, Massachusetts, to the Econo Lodge Hotel in Sharon, Massachusetts, and observed him meet with individuals who went in and out of two specific hotel rooms and back and forth to two cars:   a black Honda Accord with a Pennsylvania dealer plate, and a black Infiniti with a New York registration.   Surveillance continued throughout the day and into the night on October 4.

15.     On October 4, 2015, multiple calls were intercepted between ARIAS and a New York number believed to belong to Carlos QUESADA-VARMET, with a New York area code, one of the six individuals at the hotel besides ARIAS.   Those calls included discussions about drug trafficking.   For example, ARIAS placed a call to QUESADA-VERMET at approximately 4:57 p.m., and said "he took a little bit to test it."   QUESADA-VERMET said, "yes, that's fine."   ARIAS said, "if it passes, he will take it all."   QUESADA-VERMET said, "yes, it is original, don't worry, and …there is a lot."   Based on my training and experience and knowledge of the investigation, ARIAS and QUESADA-VERMET were discussing the need for a customer to test a sample of the drugs, and assurance that the drugs were "original," or high quality.

16.     Early on October 5, 2015, surveillance was re-established at the hotel. Three

persons, later identified as William Mendez-Lopez, Roberto Medina-Alcantra, and Christian Marino-Castro, were observed moving between two rooms with QUESADA VARMET and ARIAS. Mendez-Lopez, Medina-Alcantra, and Marino-Castro entered the black Honda Accord. Three other persons, including QUESADA-VARMET, entered the black Infiniti. The two cars left the hotel together, and both pulled into a Mobile gas station on Route 1 in Sharon, Massachusetts.

17. A Massachusetts state trooper stopped the black Honda Accord on Route 95 (Northbound) in Canton, Massachusetts. The car had a Pennsylvania dealer plate. On a Registry of Motor Vehicles query, the dealer plate did not register to an active dealership; Pennsylvania confirmed the dealer plate was not in the system. The driver was unable to answer basic questions about where they were going, other than "Lawrence." A K-9 unit was requested and, when walked around the car, alerted to the area in the front passenger footwell. Upon further search, investigators found a hidden compartment in the car that contained approximately four kilograms of a powdery substance that tested positive for cocaine; and a .40 caliber Glock 27 with 10 rounds in the magazine. In addition, inside the hidden compartment was an envelope containing three passport cards with the same picture and different names; a credit report and bills under different names wrapped around social security cards and credit cards with matching names (believed to be false identification packages), which were also seized. The five SIM cards which are part of the subject of this Affidavit were wrapped in a sheet of paper, and also found inside the hidden compartment. Mendez-Lopez, Medina-Alcantra, and Marino-Castro were arrested, their phones and the SIM cards were seized, and state charges were brought for trafficking cocaine and illegal possession of a firearm.

18. On October 4 and 5, 2015, ARIAS continued to talk to PENA about available

drugs and distributing those drugs. For example, on October 4, 2015, at 4:21 p.m. (Session 589), PENA called ARIAS on TT#2. ARIAS said, "I have something good for you." PENA said, "Are you ready now?" On October 5, 2015, at 1:47 p.m. (Session 665), PENA called ARIAS on TT#2. PENA said, "I came to bring my buddy a sample. If he likes it, he will take it all." ARIAS said, "Is what I'm telling you…it got a little weak man!" PENA said, "but this is another guy who hasn't checked it. I will give him a sample now, and he said that if he likes it, he wants 200, he's going to take it all." PENA also said, "I mentioned it to a couple of people, but all people want is a little bit only." ARIAS said, "Damn, I'm not into that." Based on my training and experience and knowledge of this investigation, PENA and ARIAS were concerned about the quality of the drugs brought by the New York source of supply, and they wanted to move large quantities at once.

### October 7, 2015: Arrest of ARIAS and AVILES, and Seizure of More Than Two Kilograms of Heroin and a Loaded Handgun.

19. On October 7, 2015, intercepted calls over Target Telephone #2 indicated ARIAS was heading to Rhode Island to meet an unidentified source of supply. (Sessions 779, 781, 789, 801, 816, 817). Surveillance followed ARIAS and a second individual, later identified as Andy AVILES, to Pine Street, Central Falls, Rhode Island. After ARIAS left Central Falls, Rhode Island, he was stopped on Route 95 North in Walpole, Massachusetts by Massachusetts State police. ARIAS was driving, and AVILES was in the passenger seat. As a result of the motor vehicle stop, the blue Honda Accord was towed to the Massachusetts Foxboro Police Barracks, and Trooper Matthew Hannigan arrived with his K-9, Flash. Flash alerted positively for narcotic odor inside the car. A search revealed a hidden aftermarket compartment under the rear passenger seat area. Inside the hidden compartment was approximately two kilograms of

heroin, and a loaded handgun.   When the car was searched, a black Blackberry phone was also found inside the car and seized (N-30).

20.    Soon after locating and seizing the heroin and the handgun, ARIAS and AVILES arrived at the barracks, along with the registered owner of the Honda, Marie Rodriguez. ARIAS and AVILES were placed under arrest based on the heroin and gun found in the car. The I-Phone was seized from ARIAS (N-35) and from AVILES (N-26) and the telephones were placed into evidence.   State charges were brought.   Thereafter a federal complaint and arrest warrant were obtained for ARIAS and PENA.

### October 13, 2015 Arrest of Juan PENA with Heroin

21.    Pursuant to an arrest warrant, on October 13, 2015, Juan PENA was arrested inside a vehicle outside his residence.   At the time of his arrest, PENA had a few grams of heroin on his person, in addition to two telephones, the Apple Iphone and Samsung T-Mobile flip phone.

22.    On November 18, 2015, a grand jury returned an indictment against ARIAS, AVILES, QUESADA-VARMET, and PENA.

### PROBABLE CAUSE TO BELIEVE LA MAKINA IS COMMITTING THE TARGET OFFENSES

23.    Based on the intercepted call set forth below, I believe that in August 2015, PENA sought to obtain drugs for distribution from LA MAKINA, as a secondary source of supply. Based on my knowledge of this investigation, together with intercepted calls to and from PENA, examples of which are set forth above, in August 2015, PENA was primarily seeking drugs for distribution from Luis Alberto ARIAS.   Multiple explicit discussions were intercepted between August 18 and August 25 where PENA anxiously sought product to sell from ARIAS.   PENA

eventually obtained controlled substances from ARIAS on August 26, 2015. For example, on August 26, 2015 (Session 746), PENA used TT#1 to call ARIAS on TT#2 and asked ARIAS how ARIAS was "going to give it to me." ARIAS said, "Buddy! Yours is better." PENA said, Okay, how did you do it then? 50 to 250?" PENA said, "Well then call me, that I am waiting for you, that I have to let go of a couple of samples right away." Based on my training and experience and knowledge of the investigation, PENA questioned ARIAS about quality, the delivery of the product, and told ARIAS that he had to give away some samples to potential customer.

24. Before ARIAS supplied PENA with product, however, on August 22, 2015, at approximately 10:57 pm (Session 563), PENA used TT#1 to call LA MAKINA on TT#3. LA MAKINA said, "What's up, my nigga?" PENA said, "Chilling …. Look dude… how do I says this..uhm… I am calling you to talk nonsense to you because I know that you are easily, you are even more of a bad-ass/harder than I am….but…" LA MAKINA said, "mmm." PENA said, "Nothing, it was to tell you that, I am getting something heavy from over there….from Atlanta, but…." LA MAKINA said, "Yeah…" PENA said, "I know you get stuff even better than me my nigga…." LA MAKINA said, "mm-hmmm." PENA said, "I know who you are man." LA MAKINA said, "No, uh-huh…uhmm." PENA said, "Is just to let you know, because you know that sometimes gets scarce." Based on my training and experience, I know that drug distributors frequently work with more than one source of supply for their drugs. Based on my knowledge of this investigation, PENA was having trouble obtaining drugs for distribution from ARIAS, and as of August 22, was growing increasingly anxious. LA MAKINA said, "No, that's fine…I'll keep you on mind, my nigga…you know that you are my people." PENA said, "You let me know, because they are passing me that stuff from there…. And it's deadly dude…over here, all the guys

are grabbing it and they are putting/adding into it the two and three and it is the best that there is, you hear me?"  Based on my training and experience and knowledge of this investigation, "the two and three" refers to the cut that could be added to the drugs; "deadly" refers to the high quality of the product.  LA MAKINA said, "Yeah…no, alright, alright…I will call you."  PENA said, "Keep me on mind over there when it becomes scarce like that….because I know that come on!....I easily need you instead."  LA MAKINA said, "No, no, by brother, don't worry that if anything I will help you out, if I need you."  PENA said, "Alright then…keep me in mind LA MAKINA."  Based on my training and experience and knowledge of this investigation, I believe that "easily need you instead" meant that PENA needed supply of drugs, and "I will help you out, if I need you," meant that LA MAKINA would consider using PENA as a redistributor for his product if he needed him.

   25.    Because only a single call to LA MAKINA was intercepted during the wiretap investigation of PENA and his associates, investigators did not immediately realize the significance of the intercepted call.  However, from continued review of the interceptions and other investigative activities, based on the call set forth above, and the further information provided below, I believe that LA MAKINA is engaged in the Target Offenses.

   26.    On January 5, 2016, QUESADA-VARMET was arrested in White Plains, New York.  He was Mirandized in Spanish, and he decided to make a statement.  He was asked if he knew an individual known as LA MAKINA. QUESADA-VARMET said he knows him and that LA MAKINA is "Bariga's" buddy.  QUESADA-VARMET was then shown pictures of ARIAS and others.  QUESADA-VARMET identified ARIAS, and said that he knew ARIAS as "Bariga." He was also shown pictures of LA MAKINA and others, and identified La MAKINA.  He said that LA MAKINA "is a heavy hitter, worldwide."  QUESADA-VARMET further said that LA

12

MAKINA lives in Jamaica Plain on Washington Street near a baseball field." QUESADA-VARMET said that LA MAKINA moves "15-20 kilos at a time" and frequently travels to the Dominican Republic and "just got back a month ago."

27. Upon learning that LA MAKINA and ARIAS were "buddies," investigators went back to review the extractions from the two phones seized from ARIAS upon his arrest, which phones were searched pursuant to a search warrant. In fact, LA MAKINA's phone, TT#3, is listed in ARIAS's contacts under "Makina," and the phone records showed at least a half dozen contacts in September 2015 between TT#2 and TT#3, before we seized TT#2 from ARIAS upon his arrest. Those calls were not intercepted because we were not yet up on TT#2 at the time the calls were made.

**Dominican Judicial Interceptions of LA MAKINA Discussing Target Offenses.**

28. On November 27, 2015, DEA in New Jersey received intelligence from the DEA Santo Domingo Country Office where a Title III investigation is underway of the Orlando Luna Cruz, a/k/a "Mofle," drug trafficking organization (the "Cruz DTO"). Cruz is located in the Dominican Republic, and used a phone assigned call number (849) 806-5515. The interceptions in the Dominican Republic revealed that the Cruz DTO's Mexican source of supply had a narcotics truck shipment destined for New Jersey, which ultimately arrived in that area on November 28, 2015. Based on intercepted calls and surveillance established by the New Jersey DEA, a car stop was conducted on November 28, 2015, resulting in the seizure of approximately four kilograms of heroin contained within false compartments inside the car.

29. A review of toll records in connection the investigation of the Cruz DTO showed Cruz, using (849) 806-5515 (the "Cruz phone"), in contact with LA MAKINA, using TT#3, on the following dates: 8/6, 8/9 (x2), 9/3, 10/19 (x2), 10/24, 10/27 (x6), and 11/25 (x3). According to

New Jersey DEA, Cruz refers to LA MAKINA as "Alex." LA MAKINA also used a second phone, ending in 5268, with the same subscriber name of Carmello Santiago and the same Boston address, which was also in contact with the CRUZ phone on 11/11 (X4), and 11/14 (x4). The tolls further show two WhatsApp contacts on 11/30 between the Cruz phone and (781) 552-9669, with no subscriber or address listed ("Phone 9669").

30. On January 19, 2015, I listened to both the call from PENA to LA MAKINA intercepted in this investigation on August 22, 2015, and intercepted calls from the Dominican Republic between Phone 9669 and the Cruz phone. Based on a voice comparison, I believe that Alex in the Cruz DTO investigation is LA MAKINA from Boston. Additional intercepted calls pursuant to the Domincan Judicial Order were made between LA MAKINA and Cruz in December that I believe demonstrate LA MAKINA is continuing to commit the Target Offenses. The information set forth below is from draft transcripts of the calls from the Dominican interceptions. U/I means "unintelligible."

  A. On December 3, 2015, Cruz called LA MAKINA on the 9669 phone, and said, "Listen, you know old man… I wish I had a factory or a warehouse, so I could just pack off and pack off, tell him that after we start we're not going to stop… to stay calm because things are the way they are, what I mean is.. get organized, while everything is being solved and while I get there, get organized with an apartment, car, with everything that has to do with it and when we start we will not stop, but he has to give us a chance/break because imagine, that was a like a photo that was sent… [Voice overlap]." LA MAKINA said, "The sample, the sample." Cruz said, "Exactly… he knows that the stuff works, but give me a chance, we are going hard, we are going hard, you heard... Listen, you don't have to call me, I will call on my own, but you have to give me a chance

14

because imagine, there are things that I don't have in my hands, but stay calm, get organized, so that everything can came out good and we can work for a long time." Based on my training and experience and knowledge of this investigation, I believe "photo" means sample, which Cruz was explaining "works," or is effective. Cruz was urging LA MAKINA to get "organized" so they could "work for a long time," which I believe means to get stash houses, vehicles, and cash in place so they can have significant amounts of drugs to distribute.

      B.      On December 4, 2015, Cruz called LA MAKINA on the 9669 phone, and said, "No, no, no… they're going to send it to you over there, wait… what happens is that the guy who has the frames is not answering my friend phone (calls), but my friend told me that the people that have the warehouse… they can send me 10, and I told him that if it's that to send me the 10 that I would send two or three at a time to my buddy over there…" Based on my training and experience and knowledge of this investigation, I believe "frames" means a quantity of controlled substance, likely kilograms, and Cruz was going to send two or three at a time. Cruz continued and said, "Listen; tell him to head up there, so they can check their stuff today, so they can tell me if that's it, so we can start working right away." Based on my training and experience and knowledge of this investigation, I believe "check their stuff" means to check the quality of the product so that they can "start working," or selling the drugs right away.

      C.      On December 6, 2015, Cruz called LA MAKINA on the 9669 phone and said, "Hello listen, that photo that I sent you is a synthetic thing." LA MAKINA said, "Yeah, but that looks like from the other stuff." Cruz said, "No, that is synthetic, listen… I am going to send… (someone) to pick up a photo, that thing is right over there where you

15

are."  LA MAKINA said, "Mm-hmm."  Cruz said, "I'm getting in contact with some people, so they can pick up the photo and give it to you, there are three (3), that came by plane… that came today by plane… (they) can send three (3) daily over there [U/I].  So then, I will send a photo of that, if that's what it is... then get ready for it, so you can receive three (3) daily for 15 days."  Based on my training and experience and knowledge of this investigation, "photo" means sample, and Cruz explained that the product is synthetic (possibly Fentanyl), and the "three (3), that came by plane" likely references three kilograms that have been delivered by air.  Cruz then told LA MAKINA that he could provide three kilograms daily for 15 days.

### REQUESTED PHONE LOCATION ORDER

31.     Based on the information set forth above, and my training and experience, I believe that LA MAKINA is currently using the Target Telephone to commit the Target Offenses, and that there is probable cause to believe that the Requested Location Information will constitute or lead to evidence regarding the Target Offenses, as well as the location of the Target Telephone that is being used by LA MAKINA.  Further, I believe that LA MAKINA is using the Target Telephone in the District of Massachusetts.  The Requested Information is necessary to determine the approximate location of LA MAKINA so that law enforcement agents can further identify LA MAKINA; conduct physical surveillance of LA MAKINA; identify other potential participants including other suppliers, runners, co-conspirators and customer/redistributors; and locate residences and stash locations.  The Requested Location Information will permit agents to locate the Target Telephone and, therefore, LA MAKINA, and will facilitate physical surveillance of those persons in a manner that reduces the chances of compromising the covert nature of the investigation.

32. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. §3103a(b)(1). Providing prior notice to the subscribers or users of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give those persons an opportunity to destroy evidence, change patterns of behavior, notify confederates, flee, or continue flight from prosecution.

33. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

34. WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C.§ 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents of the DEA to obtain the Requested Location Information for a period of thirty (30) days.

35. IT IS FURTHER REQUESTED that, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), T-Mobile furnish and continue to furnish the DEA with all information, facilities, and technical assistance needed to ascertain the Requested Information; and that T-Mobile, the service provider for the Target Telephone, further initiate a signal to determine the location of the Target Telephone on the service providers' network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and shall furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of the Target Telephone, at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime

hours, for a period of thirty (30) days. The service providers are to be compensated by the DEA for reasonable expenses incurred in providing such facilities or assistance.

36. IT IS FURTHER REQUESTED that this Order apply to any changed cellular telephone numbers bearing the same IMSI as the Target Telephone, and to any changed IMSI bearing the telephone number of the Target Telephone, within the period of the Court's Order.

37. IT IS FURTHER REQUESTED that, in the event the service provider changes for Target Telephone #1 during the course of the thirty (30) day period, such monitoring may continue with the new service provider without further order of this Court.

38. IT IS FURTHER REQUESTED, to avoid prejudice to the Government's criminal investigation, that this Order be SEALED, except that copies of the Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and T-Mobile as necessary to effectuate the Court's Order.

39. IT IS FURTHER REQUESTED that T-Mobile and their agents and employees, not disclose or cause a disclosure of the Order or the request for information, facilities, and assistance by the DEA, or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services hereby ordered. In particular, T-Mobile, and their agents and employees, shall not make such disclosure to any lessee or telephone subscriber.

40. Because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation, the United States also requests that the warrant delay notification of the execution of the warrant for a period not to exceed 30 days after the end of the authorized period of tracking (including any extensions thereof), in accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3).

_____
Mark J. Concannon
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
this 27th day of January, 2016

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts